## GORDON v. WESTTOWN ELECTRIC & APPLIANCE CO.
### No. 6760.

Circuit Court of Appeals, Seventh Circuit.
April 4, 1939.

Theodore E. Simonton, of New York City, and Foorman L. Mueller, of Chicago, Ill., for appellant.

Samuel Banning, of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

Appellee charged appellant with infringement of his United States patents No. 1,745,162 and No. 1,795,023. The former was issued January 28, 1930, on an application filed August 7, 1924, and renewed June 26, 1929; the latter was issued March 3, 1931, on an application filed April 14, 1926, and renewed July 24, 1930. The defenses were invalidity, laches and non-infringement. Claims 4 and 7[1] of the first patent and claim 9[2] of the second patent are relied upon by the appellee. The court found that appellee was not guilty of laches, and that the three claims were valid and infringed. The decree enjoined appellant from infringement of these claims, and awarded an accounting of profits and damages. From this decree the appeal is prosecuted.

Appellee's first disclosure relates to improvements in ironing machines or mangles, and has for its principal objects the provision of a simple and durable construction, relatively light in weight, and capable of being readily portable, and having a manually controlled housing at the end of the roller and shoe for actuating the ironing shoe by the power devices used to operate the roller, all of which is designed to be placed, and is operable, on top of a stand or table.

The first patent discloses an electric ironer for domestic use of the conventional rotating padded roll and heated pressing shoe type. This disclosure comprises a padded roller adapted to be rotated by a shaft, and a shoe heated by a gas burner, adapted to be moved by power into and out of ironing engagement with a roller. The machine is of the open end type, that is to say, the roller is supported only at the end adjacent the gear case, leaving the other end free, with access to it not restricted by an outboard bearing at the outer end of the shaft, thus facilitating the ironing operation. The gear

---

[1] 4. In an ironing machine, a frame, a roller rotatably supported at one end in said frame, a motor carried by said frame and operatively connected with said roller, a shoe carried by a shaft pivotally supported at one end in said frame whereby said shoe may be moved toward and away from said roller, supporting members connected with said frame at one end of said shoe and roller, and an auxiliary supporting member rotatably carried on said shaft at the opposite end of said shoe and roller and independent of said first named supporting members.

7. In an ironing machine, a roller and a co-acting shoe, an operating shaft for rocking said shoe toward and away from said roller disposed beneath the axis of said roller, a frame at one end of said roller having operating mechanism for said roller and shaft, respectively, and having means forming a support for said roller and shaft at their adjacent ends, and an auxiliary support on said shaft remote from said frame whereby the weight of said roller and shoe is partially carried by said shaft and auxiliary support.

[2] 9. In an ironing machine, a roller, a co-acting shoe, motor operated means for actuating said shoe, a lever connected with said shoe for rocking the latter toward and away from said roller, a rotating cam for actuating said lever, clutch means for said cam including a pawl rotatable with said cam and having detachable engagement with said motor operated means, means for moving said pawl out of operative driving engagement comprising a pair of tripping members disposed to automatically disengage said pawl after said cam and pawl have been rotated through a predetermined arc, stops associated with each of said tripping members for positively limiting rotation of said cam, and manually operated means for rendering said tripping members temporarily ineffective.

case or housing encloses the gearing and other mechanism for rotating the roller and moving the shoe. Power is supplied by an electric motor mounted alongside the gear case. Claims 4 and 7 are not concerned with the mechanism contained in the gear case.

The machine of the first patent is of the portable type, and the gear case and motor are of such proportions, and are so arranged that their vertical height does not greatly exceed the vertical height of the roll, thereby making the machine small and compact. Claims 4 and 7, however, are not limited in these respects.

The shoe is operated by an oscillatable shaft, the outer end of which is supported by a bracket pivotally mounted on the end of the shaft and adapted to rest on a table or like surface when the machine is in use. The inner end of the shaft is supported by lugs extending downward from the bottom of the gear case and rigidly secured thereto. The shoe extends substantially the entire length of the roller, and is supported by a pair of brackets, one at each end of the shoe, which are secured respectively to the shaft and to the shoe. Upon oscillation of the shaft the shoe is moved toward and away from the roll. The means for oscillating the shaft include an arm rigidly secured to the shaft and having pivoted thereto a link or rod which projects upward through an aperture in the bottom of the gear case, and is connected to the shoe operating mechanism in the gear case.

When in use, the device is adapted to be supported at the desired height on a table or the like, and for this purpose is provided with a plurality of bearing supports, preferably three in number, so as to accommodate itself to relatively uneven surfaces. These bearing supports comprise a leg at the forward end of the gear housing, a leg at the bottom of a motor support extending downwardly and rearwardly from the gear housing, and a third leg comprising a bracket loosely mounted in pendant position on the shaft, preferably adjacent the end thereof. The subject matter of claims 4 and 7 relates to this manner of supporting the machine.

Prior to this disclosure the standard machine was of the pedestal or heavy frame type, having the frame or support extending to the floor level, with the operating mechanism located at varying levels,

and largely below the plane of the roller and shoe. The device of the first patent was the first machine in the art to arrange the entire mechanism compactly in such a way as to permit it to be supported upon a table or cabinet at a convenient operating level, and initiated the development of a modern type cabinet ironing machine which in recent years has come into extensive use and has largely superseded previous types of pedestal or frame machines.

Appellant's accused device is a domestic ironer of the open end roll type in which both the roller and shoe are power operated. The ironing machine proper is rigidly bolted to a metal stand or table which is provided with a swinging box-like cover for enclosing the ironer when not in use. The ironer includes a gear case having a neck pedestal or base which is rigidly secured to the top of the table by four bolts. On the under side of the table beneath the gear case the driving motor is secured. From the inner side of the gear case at the back of the roller projects a tubular housing, which encloses the shoe operating shaft. This shoe shaft housing is pressed into a boss on the side of the gear case so that the housing, in effect, is an integral extension of the gear case.

The housing for the shoe operating shaft extends to about the middle of the machine, and to its outer end is rigidly secured a foot or bracket which in turn is bolted to the table top. The shoe operating shaft is journaled in bearings contained in this housing and projects slightly beyond the end of the housing and carries at its outer end an arm which serves both to support the shoe at its center and to move the shoe upward and away from the roller when the shoe operating shaft is oscillated.

The court found claims 4 and 7 valid, and we are in accord with that finding. It would serve no good purpose to discuss in detail the many prior patents cited. It is sufficient to say that appellant's expert named as the closest prior art references to the structure defined in claim 7, the Arbron patent No. 1,576,804; the Kirby patent No. 1,568,166; and the Yerkes patent No. 1,362,980. From an examination of these references, as well as all others relied upon, including the Horton prior use, it is at once apparent

that the general arrangement of none of them bears any resemblance to the disclosure now before us.

The Arbron patent is a typical example of the so-called pedestal type of machine, and Kirby's hydraulic mechanism for actuating the shoe is below the table and below the roller. It must be borne in mind that the object of the patent before us, as expressed in the specifications and rightfully to be inferred from the elements described in both claims, was to provide for use upon and above the operator's table or stand, a simple and durable construction, relatively light in weight, having a manually controlled housing for actuating the ironing shoe by the power devices used to operate the roller. This object was accomplished for the first time by appellee's disclosures, and since that time the principle thus disclosed by him has been adopted by all the leading manufacturers of ironing machines, superseding all previous forms and becoming the standardized type for household use at the present time. True, the principle involved was a simple one; all the elements used were old; and the concept now seems quite discernible even to the layman. However, so far as this record discloses, no one had previously suggested such concept, and this fact, coupled with the popular acceptance of appellee's principle, quite substantially supports our conclusion that there was more than mechanical skill involved in his disclosure.

∎ This conclusion is further supported by the fact that one of the large competitors in this line of production, when charged with infringement of this same patent, by a device quite similar to that of appellant's, settled the case on the eve of the trial by the payment to appellee of a substantial sum of money. True, such evidence of itself does not furnish a safe basis, in cases such as this, to determine the validity of a patent between other parties, and we do not refer to it for that purpose, but such evidence, in the absence of other sufficient evidence, or equally balanced evidence, as to invalidity, gives us pause in striking down the presumption of validity to which appellee is entitled.

In October 1928, appellee's machine came to the notice of the Syracuse Washing Machine Company which manufactures the alleged infringing device, and which is defending this action for appellant. On November 3, 1928, appellee sent his machine to the Syracuse Company, and submitted copies of his then pending applications for the patents in suit, together with the claims which had been allowed and those which he expected to be allowed. The company retained these until March 14, 1929, during which time it dissembled the machine and examined appellee's application papers in detail.

Prior to this time the Syracuse Company had never manufactured or disclosed any ironing device upon which the claims here in suit would read. However, in 1929, it began building a machine which was quite similar to appellee's, and on October 9, 1929, it filed an application for the Ringer patent No. 1,865,048. This patent was granted on June 28, 1932. On November 29, 1929, it also filed application for Ringer patent No. 1,894,242, and this patent was issued on January 10, 1933. As early as February 6, 1930, appellee notified the Syracuse Company that its machine manufactured under the Ringer applications infringed his first patent. The company notified him on March 9, 1930, that the charge of infringement was being investigated by it. Hearing nothing further from the company he inquired of the company whether the investigation had been completed, and on September 16, 1931, he was informed by the company that its machine was not regarded by it as an infringement of appellee's patent. The manufacture of the machine which was then complained of by appellee was discontinued by that company after two or three years. It is before us as a physical exhibit. It seems to us to quite closely resemble appellee's machine in all essential details. Inasmuch as appellant did not sell this model, it is not in issue in this case.

It is claimed, however, by appellant and the Syracuse Company, that the modern design of that company, which appellant is selling, is to be materially differentiated from appellee's machine.

Appellant contends that the first point of differentiation is with respect to appellee's independent auxiliary support pivotally mounted on the end of the shoe shaft. It seeks to avoid this element by encasing the shoe shaft in a tubular housing which is pressed into a boss on the side of the gear case, so that the housing in effect is an integral extension of the gear case. This housing extends from the gear case proper to about the middle of

the shoe and roller, and to its outer end is rigidly secured a foot or bracket which is bolted to the table top. The shoe shaft projects slightly beyond the end of the housing and the foot or bracket, which projecting shoe shaft carries on its outer end, contiguous to the foot, an arm which serves to support the shoe and to move it to and away from the roll when the shoe shaft is oscillated. By this means appellant insists that it has avoided those parts of the claims which call for an auxiliary support, or foot, or bracket, independent of the gear case, and pivotally mounted on the shoe shaft. In other words, it urges that since it has made the shaft housing an integral part of its gear case, the auxiliary foot is no longer independent of and remote from the gear case, but is rigidly attached to it, and is not rotatively attached to the shoe shaft. However, the bearings of the outer end of the shaft are contained within the housing near its outer end, and the shaft rotates as it passes through the end of the upper shank of the foot. In this sense we think there is a rotatable connection between the shaft and the foot, and that the means used constitute an equivalent to those designated in the claims and those used in the Ringer patents, and that the permanent fastening of the housing to the gear case is not sufficient to constitute it an integral part of the gear case.

Another point of alleged differentiation is with respect to the supporting members of the patented device when placed upon the operator's stand or table. The claims in suit provide for a plurality of such members, but they are not limited in number. The specifications, however, inform us that the preferred number is three, one on either end of the gear case, and the third mounted on the outer end of the shoe shaft, to which reference has already been made. This third supporting member is the subject of much discussion between the parties, and one's first impression from the specifications is that the patentee intended to have but three points of contact with the table, and that the point of contact of the third supporting member, which is independent of the gear case, is at the apex of the triangle formed by the three supporting members, which is the number preferred by the inventor, although this limitation is not in the claims. However, a reading of the claims and the specifications, in the light of the physical embodiments which are before us, teaches

us that this is not the proper construction, and does not correctly reflect the principle which the patentee disclosed. The third supporting member is not merely a leg, it is a bracket which in turn has two legs, spaced several inches apart in the direction away from the operator. The outer leg of this bracket is placed just beyond the point where force is applied to the shoe to contact it with the roller. This is quite necessary in order to prevent a tipping of the shoe and roller when that force is applied.

Appellant makes use of the same principle. His supporting means near the center of the shoe is also a bracket. Instead of having two legs, the bracket is constructed in one piece with a continuous base about three inches in length, in the direction away from the operator. It differs from the patent in suit in that the outer edge of the shoe supporting member does not extend beyond the point where force is applied to the shoe when in use. This, of course, would not prevent the shoe and roll from tipping when in use without other means of support. It has cured this difficulty, however, by bolting its bracket support to the table. We think this is merely an equivalent of the means employed by appellee to accomplish precisely the same purpose.

Claim 4 places its auxiliary supporting member on the shoe shaft "at the opposite end" of the shoe and roller. Literally this would also extend the shoe shaft to that point, and appellant contends that it does not infringe this claim because its corresponding support is placed in the center, longitudinally, of the shoe, just as in all of appellee's physical embodiments, including the one originally inspected by appellant. The principle here involved is that this support may be placed, theoretically at least, at any point from the outward end of the shoe, inwardly toward the gear case, to where the weight of the roll and shoe will not tip the gear case. Giving this claim the liberal construction to which we think it is entitled, we are of the opinion, under the circumstances here presented, that it should be construed sufficiently broadly to protect the principle involved. Claim 7 clearly covers this point by placing the supporting means at any point on the shaft remote from the gear case.

Appellee's two supporting members on the gear case are merely short legs, one

extending from each end of the case to the table. Appellant seeks to avoid these elements by the use of a metal plate resting upon and bolted to the table, at each of the four corners of the plate. It slopes inwardly and upwardly to form a small pedestal-like structure, upon which the gear case rests. All of these parts are integrally constructed. The motor is suspended beneath the table, but as it constitutes no part of the patent, its position below the table top is not sufficient to avoid the claims. It is obvious that appellant's gear case is supported at each end by the ends of the plate, just as the gear case of the patent is supported at each end by a leg. The only difference between the two constructions is that appellant has in effect either cut off the legs evenly with the base of the gear case, or has filled the entire base of the gear case even with the bottom of the legs, just as it did with the supporting member of the shoe shaft. If the shoe shaft housing is, as appellant contends, an integral part of the gear case, then certainly its plate, and the pedestal-like structure which supports the gear case proper, are integral parts of the gear case, and this we think appellant does not deny. Obviously this is true, regardless of our holding as to the housing. If the edges of appellant's supporting plate were extended to the circumference of its cam-shaped structure which contains its gears, we would have the same form of structure, minus the legs, which the patent discloses. Appellant's pedestal-like structure adds nothing but beauty, and perhaps eliminates extra weight, while the patent saves the extra weight of a solid base by using two short legs. What the patent discloses, we think appellant has accomplished by the use of equivalents, and we feel constrained to hold that it has infringed claims 4 and 7 of the first patent.

The ironing machine of the second patent is of the same general type as the first. It comprises a roller mounted on a rotatable shaft, a shoe supported by an arm fixedly secured to the outer end of an oscillatable shoe-operating shaft, and a gear case on which both shafts are journaled.

A drive shaft projecting from the rear of the gear case is continuously rotated during the operation of the machine by a belt and pulley driven by an electric motor, and carrying a worm, which in turn continuously rotates a worm wheel. This wheel is secured to a shaft which by means of three speed-reducing gears, one of which is an idler gear, drives the roller shaft. The idler gear is mounted on a pivoted arm so arranged that the driving connection to the roll is automatically broken when the shoe is away from the roll. The worm shaft also has secured thereto a ratchet wheel having a series of notches. This ratchet wheel forms one member of the shoe clutch. The other member comprises a sleeve loosely mounted on the worm shaft which carries a clutch pawl pivated to the sleeve. One end of the pawl is adapted to be engaged under certain conditions with one of the notches of the ratchet wheel, and for that purpose the pawl end is urged toward the ratchet by a spring. The position of the pawl is controlled by a clutch actuating arm which cooperates with the other end of the pawl. This arm has bifurcated ends adapted to straddle the worm shaft, and each end carries a separate tripping member and a separate stop member. These tripping members are adapted to cooperate with the end of the pawl.

The clutch actuating arm is pivoted to the gear case and is normally held by a spring adjacent the pivot in a position such that the tripping members are disposed in the path of the pawl end. The operator may move the arm and its tripping members away from the pawl by pressing a handle on the top of the gear case, which, through the medium of a shaft and a lever, swings the arm about the pivot. When the operator releases the handle, which is intended to be only momentarily pressed, the arm will swing back to its normal position. The question now before us with respect to claim 9 of this patent refers more particularly to the construction of the clutch for operating the shoe.

When the parts are in an at rest position of the shoe clutch, the upper tripping member is depressing the pawl end against the force of the spring so that the pawl end is maintained out of engagement with the ratchet wheel, which is constantly rotating when the machine is in operation. If the operator pushes the handle on top of the gear case, the clutch actuating arm will be swung about its vertical pivot, so that the upper tripping member is disengaged from the pawl end, whereupon the spring will force the outer pawl end into engagement with one of the notches of

the ratchet wheel. The sleeve, loosely mounted on the worm gear shaft, will then commence to rotate with the ratchet wheel, thus constituting the engaged position of the shoe clutch.

If the operator has only momentarily pushed the handle, the clutch actuating arm will swing back to its normal position, thus carrying the lower tripping member into the path of the rotating pawl end. The tripping members are in effect cam surfaces inclined from their open ends to the ends where the stops are located in a direction toward the worm gear shaft. The rotating pawl end therefore strikes the inclined surface of the lower tripping member and is gradually forced inward toward the worm gear shaft until the other end of the pawl is moved out of engagement with the notch of the ratchet wheel, whereupon the sleeve and its associated parts come to rest.

When the operator again pushes the handle, this action is repeated, with the lower tripping member releasing the clutch pawl, and the upper tripping member causing the disengagement of the clutch. Each momentary actuation of the handle produces a half revolution of the sleeve. The sleeve in turn imparts its movement to the eccentric cam which is loosely mounted on the worm gear shaft adjacent the sleeve, and through a slot in which the outer pawl end projects. The rear of the eccentric cam bears against the arm which is loosely mounted on the shoe shaft and is resiliently connected to an arm fixed on that shaft, thus producing oscillation of the shoe shaft by the rotation of the cam. The cam is designed to have two at rest positions, one with its highest point in engagement with one of the co-acting arms, and the shoe fully engaged with the roll; and the other when the opposite low point of the cam is in engagement with this same co-acting arm, and the shoe is disengaged from the roll. To achieve this result the tripping members of the patent are so located as to withdraw the inner end of the pawl from engagement with the ratchet wheel as the cam approaches one or the other of these two positions. The pawl must be completely withdrawn from the ratchet wheel before that end of the pawl reaches the nearest stop. After the pawl is thus withdrawn from the ratchet wheel, the only force tending to produce further rotation of the pawl and cam is the momentum of the moving parts.

Claim 9 is addressed to a group of power transmission elements which oscillate the shoe shaft, thus causing the shoe to approach and recede from the roll during the intended cycle of operations. As heretofore stated, it is necessary at stated intervals to engage the cam with its shaft for a limited period, and to automatically disengage it at the conclusion of that period. In this respect it is desirable to positively limit the movement imparted to the cam so that it will not over-run its intended period of movement through inertia or wearing of the parts. To do so would have the effect of altering the pressure applied by the shoe against the roll and impair the precision and accuracy of the operation. In order to prevent this overrunning of the cam, if the driving connection has been broken, stop fingers are provided which block any excess movement of the tripping dog and with it the cam. By this means further movement of the parts is arrested. Appellee contends, and we think rightly so, that claim 9 includes means for both camming the dog out of the notched wheel and for stopping the dog at the conclusion of the unclutching operation. He admits that if the parts are fitted with extreme precision so that the driving power is released at the exact instant when the high point of the cam is active in advancing the shoe, and the maximum pressure is thereby thrown on to the cam, there is little likelihood of overrunning. However, he contends that slight inaccuracies in the fitting of the parts, or the effects of wear, or the variations in the speed of operation occasioned by changes in voltage or the like, may establish a set of conditions which would allow the cam to overrun its intended cycle, and that the stops which he has provided in the patent positively guard against such conditions.

In appellant's machine the operating lever has a forked end which straddles and bears on both sides of the eccentric cam near the bottom center of the gear case. The other end of the lever is secured by a locking block to the inner end of the shoe operating shaft. Rotation of the eccentric cam produces oscillation of the shoe operating lever and shaft, and when the cam is in a down position the shoe is against the roll. As in the patented machine, the function of the appellant's shoe clutch is to produce successive half-revolutions of the eccentric cam.

Immediately back of the eccentric cam, and secured to the same shaft, is a circular housing which contains the pawl, or a clutch bolt, of appellant's shoe clutch, and certain mechanism associated therewith. This pawl is mounted to slide in radial guides, and its position is controlled by a pawl lever, one end of which is pivoted to the circular housing and the other end of which projects through an opening in the side wall thereof. The pawl and its lever are urged inward by a spring. A ratchet wheel which is constantly rotating when the machine is in operation is loosely mounted on an eccentric shaft behind the housing, and the pawl is adapted to engage in a notch in the ratchet wheel when the pawl is moved radially inward by the clutch bolt lever and its spring.

The mechanism for operating the clutch bolt lever includes a hand lever, the depression of which springs the shoe release lever assembly sidewise about a horizontal axis. Upon release of the hand lever, the assembly is returned by a spring to its normal position. Two arms depend from the assembly, one on each side of the housing, and have ends that are disposed in the path of the protruding end of the pawl lever. The ends of these arms are tripping members or stops.

When the machine is at rest, with the motor running, a pressure of the hand lever will swing the left hand tripping member out from under the protruding end of the pawl lever, whereupon the spring will pull the pawl lever inward, thus forcing the pawl radially inward into engagement with the notch of the ratchet wheel. The housing and the eccentric cam and their shaft will then begin to rotate, continuing until the slightly protruding end of the pawl lever strikes the right hand tripping member, whereupon the pawl lever will be swung outward, withdrawing the pawl from engagement with the ratchet wheel, and the cam and its associated parts will come to rest, having completed approximately a half-revolution.

The outward swinging of the rotating pawl lever when it strikes a tripping member is not unlimited, for the pawl lever is still capable of a substantial amount of further outward swinging movement against the tension of the spring when the eccentric cam has stopped and the projecting end of the pawl lever is resting motionless against the end of the tripping member. Hence, appellant contends that the tripping member and the pawl lever do not constitute a positive stop for the pawl and cam which determines the position in which they come to rest. If the cam should be forced past its normal stopping position with the tripping member interposed in the path of the pawl lever, the pawl would become jammed in the rotating ratchet wheel, and as appellant contends, the tripping member would constitute a stop to the continued rotation of the pawl and cam.

In appellant's machine, the operative tripping member completes the withdrawal of the pawl from the rotating ratchet wheel just as the eccentric cam reaches the desired position, and appellant contends that the cam then promptly stops because its driving power has ceased and the cam is heavily loaded by appellant's forked lever. The same braking action also takes place when the cam is in its up position and the shoe is away from the roll, but appellant concedes that at such time the braking force is not so great. It is further conceded that it is theoretically possible for appellant's cam to overrun a slight amount past its down position, due to inertia, but appellant urges that if it did overrun a slight amount it would back up because it would then be in dead center, or at the high pressure point, and it is so heavily loaded by the weight of the shoe and all of its associated parts. Appellant further urges that in case it should overrun in its up position, a similar backing up action would take place by reason of the weight of the shoe being exerted on the cam through the forked lever.

Appellant therefore contends that its shoe clutch depends for the stopping of the cam simply upon the withdrawal of power from the loaded cam, and that its tripping members do not and cannot function to interrupt in its coasting of the cam at definite points as appellee's positive stops are intended to do. The dog in appellant's machine is pivoted at one end to a disc which is a part of the cam, and with it is loosely mounted on a constantly rotating shaft. The dog lever engages a clutch bolt which when moved outwardly will engage with outwardly facing ratchet teeth on a constantly rotating toothed wheel, which is fast with the shaft, and a double ended tripping device is provided with fingers at each end so positioned as to en-

gage the projecting free end of the dog after the cam has been rotated a half-revolution. As the cam continues to rotate, the free end of the dog, being held stationary by contact with the proximate tripping finger, will retract the clutch bolt and break the driving train, and at the same instant the cam will be held against overrunning by a positive engagement of the projecting end of the dog with the tripping finger. By manually swinging the tripping device away from its engaging position, the dog will automatically permit a re-clutching of the parts, and the operation will continue for another half revolution.

It seems to us that this arrangement involves a mere redisposition of functions as compared with the patent. The appellant uses stops which serve to retract the dog and clutch bolt·in a manner equivalent to a camming operation, and ·after this unlatching movement has been exhausted, so that the dog can move no farther, the stops perform the stopping function as defined in the patent, and positively lock the cam against overrunning. In other words, the stops of appellant in conjunction with the dog are fashioned to perform a clutch releasing operation which terminates in a positive stopping operation after the movement of the dog has been exhausted, while in appellee's machine the dog, moving along the cam flange, effects the releasing operation by its preliminary movement and is positively stopped by contact with the inturned stop finger after the releasing movement has been exhausted. We are convinced that the means thus employed by appellant must be considered as equivalent to those employed in claim 9 of the patent.

Appellant further insists that in view of the prior art, claim 9 must be held invalid. It is true that the prior art shows many instances of automatic tripping mechanism for disengaging the power from the cam, but there seems to be no instance in the art in which a positive termination of the cam movement is insured by the provision of a stop, as set forth in claim 9. The nearest approach to this element was referred to by appellant's expert as United` States patent to Arbron, number 1,576,804. He suggested that when the pawl in that patent was withdrawn by a wedge-shaped element, the gear could not rotate or be forced to rotate any farther because of the jamming effect of the wedge against the pawl. He found no description of such jamming effect in the patent, but he said that he knew the function of it, had seen it work, and had built them and knew that it worked that way. The Arbron clutch was in evidence, and it is now before us. It was demonstrated in the record, and we have verified the fact, that if the speed of this clutch is increased even moderately, the pawl will pass the wedge, and it is obvious that ordinary wear in the working parts would seriously affect the parts of such a tripping mechanism even though initially designed correctly.

We think the second patent is valid and that the court did not err in holding that claim 9 was infringed. The record does not support the charge of laches.

Decree affirmed.