## GORDON v. CONLON CORPORATION et al.

### No. 2071.

District Court, E. D. Illinois.

Dec. 20, 1941.

Samuel W. Banning and Thomas H. Sheridan, both of Chicago, Ill., for plaintiff Gordon.

Arthur H. Boettcher, of Chicago, Ill., for defendant Conlon Corporation.

George I. Haight and William E. Lucas, both of Chicago, Ill., and Frank T. Miller, of Peoria, Ill., for defendant Westinghouse Electric Mfg. Co.

William P. Bair, Will Freeman, and Anthony W. Molinare, all of Chicago, Ill.,

for defendant Electric Household Utilities Corporation.

BARNES, District Judge (orally).

The Court is indebted to counsel for their thorough preparation and careful presentation of this case.

The case involves the alleged infringement and validity of two patents, Gordon patent No. 1,745,162, issued January 28, 1930, on an application filed August 7, 1924. Claim 7 is charged to be infringed by all three defendants, namely, Conlon Corporation which manufactures an ironer which will be hereafter referred to as the Conlon ironer; Westinghouse Electric & Manufacturing Company, which manufactures an ironer which will be hereafter referred to as the Westinghouse ironer; and the Electric Household Utilities Corporation, which manufactures an ironer which will be hereafter referred to as the Thor ironer.

The other patent involved is the Gordon patent No. 1,795,023, issued March 3, 1931, on an application filed April 14, 1926. Claims 7, 8 and 9 are charged to be infringed by Westinghouse Electric & Manufacturing Company.

These patents were before this Court in the year 1938 in the case of James Gordon against Westtown Electric & Appliance Company, a distributor of a company which manufactured a machine known as the Easy machine. In that case Claims 4 and 7 of the lower numbered patent, and Claim 9 of the higher numbered patent, were in suit.

This Court held the claims infringed and the patents valid, and the decree of this Court was affirmed by the Circuit Court of Appeals for the Seventh Circuit in the case of Gordon v. Westtown Electric & Appliance Company, 103 F.2d 139.

Because of the fact that these patents have heretofore been before this court, and have been considered by the Circuit Court of Appeals for this Circuit on an appeal from this Court, this Court has deemed it wise to refresh its recollection of some fundamental principles of law in order that it may be guided thereby in whatsoever it may be called upon to do.

Accordingly the Court has consulted Walker on Patents, Deller's Edition, Volume 1. At page 115, it is said: "The question of invention is a question of fact and not of law. * * * The question is one of evidence in each case, and the issue necessarily depends upon a shifting standard, just as in cases of due care."

At page 294, it is said: "Questions of novelty are questions of fact."

In the third volume of the same work, at page 1745, it is said: "Whether a particular thing made or used or sold by a particular person, infringes a particular claim of a particular patent, is always a question of fact."

At page 1906 of the same volume of the same work, it is said: "The points of law actually decided by the Circuit Court of Appeals of any Circuit are binding on all of the District Courts in that Circuit."

At page 1907, it is said: "The points of law spoken of in this section include the construction given to Letters Patent, where the evidence of the prior art and the other facts relevant to that construction remain unchanged, as well as the rules of law in general."

Page 1910: "Where a question of fact in a patent case has been decided by a Circuit Court of Appeals, that decision is binding in all cases in the District Courts of the same Circuit wherein the evidence is substantially the same."

The following principles seem to be sustained by other authorities which were examined:

"A decision as to the validity of a patent is conclusive in the same court in a subsequent case, unless there is materially different evidence."

"While a former decision as to the validity of a patent is notres adjudicata against persons not parties to the former suit, the determination of validity on full hearing in a contested suit will not be reconsidered, unless clearly shown to be erroneous."

In the case at bar, Mr. Gordon testified that he built or caused to be built in a machine shop in the town of Cicero, a suburb of this City of Chicago, an ironing machine. In it he sought to have incorporated his ideas of such a machine but the finished article when delivered to him weighed approximately 250 pounds; it cost, as I recall, something like $250; he kept it only a few days and then put it out in the alley for a garbage man to carry away.

Subsequently he built a second machine and it was for the ideas embodied in this

second machine he sought the patent which was applied for in the application filed August 7, 1924.

In 1924 he built five other machines which he called his No. 10 model, and therein embodied the ideas for which he sought a patent which was applied for in the application which was filed April 14, 1926.

Mr. Gordon said that second machine was built for him on Clinton Street, in the City of Chicago; the five No. 10 machines were built in a building on Paulina Street in the City of Chicago; four of the No. 10 machines were electric machines and one was a gas machine.

In the Westtown case Mr. Gordon testified:

"I first conceived the idea of building a machine such as shown in my first patent in 1920, but I did nothing about it other than just let it simmer, so to speak, until 1922. In 1922 I built the first model. The purpose of the model was merely to try out the principles to see whether or not I could plan the things I was after. I learned some things from that first model, and found I had made some mistakes, and corrected them, and in 1923 I built a second model. From this second model I got all the information I wanted, and I proceeded then to build the model shown in my first patent. That was early in 1924. I might say that the two previous models I built, I did not feel were of sufficient value to warrant spending the money for a patent application. I made no effort to patent them. They embodied the same general features in regard to the manner of supporting the machine against overturning. All through those same ideas were maintained.

"I have present in the court room one of the earlier machines which I built. I call it model 10. It was built in 1924. There were just five machines like Model 10 built. They were sort of a trial horse on the idea of selling them. I built five in 1924 and sold them to people whom I knew and asked them to give me their reactions after they had used them. This particular machine here in the court room is one of the five that I sold in 1924. It was sold to Mr. Ralph G. Schur, of Chicago. He just walked into the court room. I got possession of this machine for the purpose of this trial from Mr. Schur. So far as I know it has been in his possession ever since I sold it to him. Aside from wear and tear, the machine appears to be in the same condition it was at the time it was sold. There is no change in the structure of it that I am able to see."

About two pages later in the transcript it appears that it was stipulated that Mr. Schur bought the Model 10 machine in 1924, and that it has been in his possession ever since.

Mr. Gordon in this case said that he was mistaken about there being three machines prior to his application for his first patent; that the so-called second machine was a mere idea or a mere drawing, or something of the sort.

There have been introduced in evidence in this case some blueprints which came from the file of the solicitor who solicited the first Gordon patent in suit. Those blueprints do not show otherwise than by pen and ink writing thereon the "auxiliary support on said shaft remote from said frame whereby the weight of said roller and shoe is partially carried by said shaft and auxiliary support."

I have just quoted the last element of Claim 7 and I say that those blueprints do not show otherwise than by pen and ink writing thereon that auxiliary support and I gather from the evidence here in court that that writing was probably put thereon some time after those blueprints went to the office of the patent solicitor. Furthermore, those blueprints showed an element which has been referred to here, and which was referred to in the prints, as No. 109, which element, if it were incorporated in the machine, would make the so-called "auxiliary support" referred to in the last element of Claim 7, unnecessary.

By evidence presented here in court, Mr. Gordon has sought to carry the date of his first patent back to some time in 1923, and the date of his second patent back to some time in 1924.

The Court cannot refrain from saying that as regards many things concerning which a person in Mr. Gordon's circumstances might be expected to have very clear recollections, he has failed to have any recollection whatsoever. For instance, he cannot remember the name of the machine shop in which his first ironing machine was built, and he cannot locate it any more definitely than within the town of Cicero. I suppose the Court would be warranted in taking judicial notice, if it

were material, that even in 1922 or 1923, the town of Cicero had a population probably in excess of 75,000 people.

He had difficulty remembering where his so-called second machine in this case, the third machine of the Westtown ·case, was built. He could not remember where he had parts made or prepared. Although he said that these five No. 10 machines were made for the purpose of having them tried out, he cannot remember the names of the persons to whom he gave them in order that they might be tried out, other than the names of two persons, Mr. Schur and Mr. Egan.

There is an utter dearth of documentary evidence whereby the dates of either of these inventions may be carried back prior to the filing dates.

In respect of the date under the first patent the matters relied upon as fixing the time are, first, a fire in the premises of the Green Duck Company, a manufacturing company in the City of Chicago; second, a deed of conveyance to one of Mr. Gordon's friends and acquaintances; and, third, a trip by one Winter to visit his father in some one of the Eastern states.

When I first began to try this class of cases which we are now considering, I thought the rule in respect of the kind of evidence necessary in order to carry back dates under patents was unnecessarily harsh and unreasonable, but I have changed my mind about that. When people get to testifying about something that happened ten, twelve, fourteen or fifteen years back, and something which at the time was not of vital importance to themselves, it seems to the Court that in the proper administration of justice they ought to have some monument in the way of documentary evidence whereby to chart their courses, because if they do not, even though they be honest, they are too likely to go astray, and too likely to state to be a fact what they desire to be a fact rather than what they know to be a fact.

■ The Court cannot accord to the invention under the first patent any earlier date than the application date.

We have observed that upon the trial of the Westtown case there was produced in this court, as an exemplification of the ideas of Mr. Gordon, expressed in his first patent, a No. 10 model machine which Mr. Gordon says he sold to Mr. Schur, and which machine was then stated by Mr.

Gordon to be in the same state in which it was when he sold it to him. That machine was, as we have observed, in that case stipulated into the record.

In the proceedings preliminary to the trial of this case, it was made to appear that the Schur machine had been changed in at least two particulars. The motor had been changed and the heating element had been changed therein, unless the machine was made at a later date than it was stated to have been made. If it were made at a later date than it was stated to have been made, then perhaps the heating element has not been changed.

Then there was produced in this case the so-called Egan machine, another one of those No. 10 models. The shoe of that machine was opened here in court and the shoe was found to contain home made heating elements consisting of mica with wire wound around a portion of the mica and the whole surrounded by a mica envelope. These two home made mica and wire heating elements were fastened into the shoe by means of bars extending across the elements and attached at each end to clips. The clips were at such places on the inside of the shoe as would enable them to fit Weigand heating elements, of which the evidence shows Mr. Gordon had two in August or September of 1925, I think it was, and eight or more in 1926.

The undisputed evidence in this record is that the mica and the wire in the heating elements in this Egan machine have not been subjected to the heat necessary for ironing clothes for a longer period than a very few hours. As a matter of fact, an experiment has been conducted in this court whereby it was demonstrated that the binder, which is holding the mica together, had not been burned out prior to the experiment. It was burned out during the experiment. A small portion only of one of the elements was used for that purpose.

The inference is unavoidable that Mr. Gordon fixed up this Egan machine for the purpose of this trial. What all of his motives may have been, the Court does not know. One of the motives may have been to carry back the date of invention under the second patent to a time which would antedate some art which would otherwise be prior art; while, if the machine had been allowed to remain with the Weigand elements in the shoe thereof, it would have been apparent that the ma-

chine could not have an earlier date than 1926 when Mr. Gordon first purchased heating elements from the Weigand Company. The result of this is that the Court cannot give an earlier date under the second patent than the date of the application.

Another extraordinary thing happened to the second machine. The second machine in this case, the third machine of the Westtown case, was junked. It was junked in 1936 by an employe of Mr. Gordon at a time when the business of Mr. Gordon was being moved from one place to another. Mr. Gordon says he did not know of that junking until 1941, although he tried two patent cases, one in this court and one in New York, in the interim.

This Court found in the Westtown case that: "The machine of the first Gordon patent was the first machine in the art to thus compactly arrange the entire mechanism in such a way as to permit it to be supported upon a table or cabinet at a convenient operating level, and initiated the development of a modern type of cabinet ironing machine which in recent years has come into extensive use and has largely superseded all previous types of pedestal or heavy frame machines having the frame or support extending to the floor level, with the operating mechanism located at varying levels and largely below the plane of the roller and shoe."

The court is now satisfied as a result of the trial in this case that the Court was then in error in what the Court has just now read. On this record, so far as Mr. Gordon, the Westinghouse Company, the Electric Household Utilities Company and the Conlon Manufacturing Company, are concerned, the Conlon Manufacturing Company is the father of the cabinet machine. You will observe that I have limited my consideration to the four entities, Mr. Gordon and the three defendants. So far as the four are concerned, the Conlon Company is the father of the cabinet idea. The Conlan Company developed the cabinet machine in October, 1925. It exhibited it in December, 1925; it advertised it in February, 1926; it sold 5,400 before the end of 1928 and before Mr. Gordon began his negotiations with the Maytag Company or the manufacturer of the Easy machines. Mr. Gordon advertised his Model 10 in July, 1926, eight months after the Conlon Company exhibited their machine and five months after they advertised it.

I do not say that would have anything to do with the validity of the Gordon patent, but it would have a good deal to do with the question of the fatherhood of the cabinet ironing machine, because Mr. Gordon's application lay in the Patent Office from August 7, 1924, to January 28, 1930. It did not come out until about four years after the Conlon Company had exhibited their machine to the world.

It is desirable that we consider the terms of Claim 7. They are as follows: "In an ironing machine, a roller and a co-acting shoe, an operating shaft for rocking said shoe toward and away from said roller disposed beneath the axis of said roller, a frame at one end of said roller having operating mechanism for said roller and shaft, respectively, and having means forming a support for said roller and shaft at their adjacent ends, and an auxiliary support on said shaft remote from said frame whereby the weight of said roller and shoe is partially carried by said shaft and auxiliary support."

Ordinarily I like to consider the question of infringement before I consider the question of validity. Sometimes it is impossible to do that; many times it is impossible to do that, because one cannot determine the question of infringement until one determines the breadth of the claims, and one cannot determine the breadth of the claims until one knows something about the prior art. That is the situation here.

So I shall proceed, and if I jumble up the question of validity and the question of infringement, it will be because of the difficulty to which I have adverted.

Counsel for the defendants and their experts, have presented charts wherein they set forth six elements which they say the patentee Gordon in his specification says are to be found in his disclosure in his first patent.

I am not going to read the whole of these charts. They are worthy of reading, but I am just going to refer to them.

The first element which counsel say Mr. Gordon claims, is this: "A light weight, portable, table-top ironing machine."

And they point out in the specification the places where the patentee makes those claims. And they say that no one of their machines is "a light weight, portable, table-top ironing machine", and they are correct in that conclusion.

And the second element which they say Mr. Gordon claims is to be found in his machine, is: "A frame and gear housing at one end of the machine"

And they point out in the specification places where the patentee makes those claims. And they say that they do not have "a frame and gear housing at one end of the machine", and I think they are right about that, clearly right about that. They say, and they demonstrate, that their frames begin with the two tube like structures which form the supports for the roller and the shoe, continuing through the gear housing down into the table top, if one desires to call it a table top, or cloth pan, if you desire to call it a cloth pan, down through the reinforcing of the table top or cloth pan and down through the legs supporting the structure, to the floor; and which legs are bound together by strengthening rods. I think they are right about that. I think that whole thing is the frame.

On the other hand, Mr. Gordon's frame is all over at one end of the roll and the shoe. So that the defendants say that element is not in their machines and I think they are right about that.

The third element which the defendants say Mr. Gordon says is to be found in his invention is: "A shoe mounted upon and carried by a rocking shaft."

The Westinghouse Company says "While we have a shoe it is not mounted upon or carried by the rocking shaft." The other two companies say, "Yes, we do have a shoe mounted upon and carried by the rocking shaft", and the Westinghouse Company is right in its contention, in the Court's judgment; and the other two companies are frank in their confession in respect of this third item.

The fourth element which the defendants' counsel say the patentee claims for his invention is: "A three-point support on the table top whereby the machine may readily accommodate itself to uneven surfaces."

And defendants say they do not have that element. They say the defendants' machines are floor models not adapted for use as a table top and not having a three-point support; and they are right in that contention.

The fifth element which counsel for defendants say that the patentee claims in his specification, is: "Two supporting legs connected with the frame at the heavy end of the machine and designed to readily accommodate the machine to uneven table-top surfaces."

Defendants say, no, the defendants' machines have no supporting legs for accommodating them to uneven table top surfaces and cannot be used on top of a table; and they are correct in that contention.

The sixth element which counsel for defendants say the patentee claims in his specification, is: "An auxiliary support rotatably carried on the rocking shaft in loosely mounted pendant position, removed from the frame and independent of the first two supports so that the rocking shaft acts as one supporting leg of the entire machine, and the weight of the roller and shoe is partially carried by the shaft and the support."

And the defendants say, and all of them say, no, the defendants' machines do not have an auxiliary support which is carried on the rocking shaft which is remote from the frame, or which is independent of the first two supports, as is the essence of the Gordon disclosure. Defendants' rocking shafts do not act as supporting legs for their machines, and they do not partially carry the weight of the roller, as in Gordon. And in the Court's opinion the defendants are right in that contention.

Now some question may arise as to what prior art this Court should properly consider in determining the question of anticipation, and in determining the question of invention or no invention.

Offhand, it seems to the Court that probably this Court should not now consider as anticipation any prior art which was considered by this Court and the Circuit Court of Appeals in the other case, but again, offhand, this Court thinks that it might possibly properly consider on the question of invention the whole mass of the prior art, including that which was offered and received in the former case, and which was before the Circuit Court of Appeals; but as the Court views the matter, it makes no difference if it excludes from consideration the prior which was offered and received in the former case and considers only the art which was offered and received in this case.

The Court comes to this conclusion, that the fundamental mistake which this Court made in the other case, was in the breadth

which it gave to the claims of the plaintiff. It is probably true that there is not anything in the prior art which has been offered and received here in direct anticipation of the disclosure of the Claim 7 of the first patent; but whether or not there was any invention in that seventh claim is a much more serious question.

Now as illustrative of how a non-technical mind operates, the piece of prior art which I like best is that old Remy patent way back in 1883. You know, after Remy disclosed that crude device to the world, it seems to the Court there was not very much left to be done except to make improvements. There is no electricity there either for power or for heat. But to the Court that looks like a fundamental patent, at least so far as this record is concerned, unless somebody anticipated him. It looks to the Court like that man invented something and all the rest of us have just been playing around with improvements ever since.

Take that Lieb patent of 1885; he had very little over Remy of 1883, very little. It was an improvement. But what does Gordon in 1930 have over either of them? What does he have over either of them? What does he have over Remy? All that he has is that little "auxiliary support on said shaft remote from said frame whereby the weight of said roller and shoe is partially carried by said shaft and auxiliary support." That is all he has, in this Court's opinion.

The prior art which was offered and received in this case, and which was not offered in the Westtown case, is Norris patent 741065, issued in 1903; Hume patent No. 1,701,720, issued in 1920, and in accordance with the teaching of which the Thor No. 75 machine was manufactured; the Prachar patent 1,753,939, filed January 18, 1924, issued in 1930; filed before Gordon; Remy patent, 275,081, of 1883; Lieb patent 330,032, filed in 1885; the Gustafson re-issue 14,074, issued in 1916; Potter patent 1,593,597, issued in 1926, filed June 11, 1921; the Thor ironer No. 30, Exhibit E-39, an exemplification of the disclosure of the Hume patent 1,712,958, issued May 14, 1929, on an application filed in November 1924; the Baby Grand machine, the Wonder machine, the publication relating to the Simplex ironing machine, as illustrated on page 73 of the May, 1913, issue of the Ladies Home Journal. I think those disclosures are all pertinent, perhaps some

of them only because of the claims made upon behalf of the Gordon patent.

The defendants say that there stands between the Gordon patent and the defendants' structures, the Simplex machine disclosed in 1913. It is a portable table top machine. The Baby Grand machine, a product of 1921. It is a table top ironing machine. The Hume patent No. 1,701,720 and the Hume patent No. 1,712,958.

The Court is clearly of the opinion that the Hume patent No. 1,712,958, or perhaps the Court had better say, the Thor machine No. 30, is prior art to the disclosures of the first Gordon patent.

The Wonder machine, the Horton ironing machine, all stand between the Gordon patent and the defendants' structures. And the Conlon Manufacturing Company says that, all that we have done is just rearrange the disclosure of the Mikulasek patent No. 1,417,625, and they are right in that contention. All that they have done is shorten the vertical structure and bring the motor and the shaft extending from the motor up nearer the table top.

The Court is inclined to conclude, and does conclude, that the Claim 7 of the Gordon patent is valid, but that the claim is not entitled to a broad construction, and that the only thing new in that disclosure is that "auxiliary support on said shaft remote from said frame whereby the weight of said roller and shoe is partially carried by said shaft and auxiliary support." That is the only thing that is new. The defendants do not have it.

Now taking up the elements of the seventh claim:

"In an ironing machine",
Of course each of the defendants has an ironing machine.

"a roller end"
Each of the defendants has a roller.

"a co-acting shoe",
Each of the defendants has a co-acting shoe.

"an operating shaft for rocking said shoe toward and away from said roller disposed beneath the axis of said roller,"
Each of the defendants has an operating shaft of that kind.

"a frame at one end of said roller having operating mechanism for said roller and shaft, respectively, and having means forming a support for said roller, and shaft at their adjacent ends, and"

Now the defendants have frames and operating mechanisms and have support for said roller and shaft, but they do not have the sort of frame which is described in that claim as, "a frame at one end of said roller."

Neither do they have that last element in that claim, which is: "an auxiliary support on said shaft remote from said frame whereby the weight of said roller and shoe is partially carried by said shaft and auxiliary support."

■ Now the Court has said that it is inclined to hold, and does hold, that that Claim 7 is valid but it must be narrowly construed. The Court thinks it is fair to state, however, that in coming to that conclusion the Court labored for a while with the question of utility. That is a serious question. Does that auxiliary support out at the end of the rock shaft, when one bears in mind that the pressure upon that roll by means of rocking the shaft, is said to be something like 250 pounds, does the auxiliary support out at the end of the rocking shaft have any utility? It seems to the Court to be a very serious question. That is, a support such as the patent discloses, does it have any utility? If it has no utility, it is not such a thing as is entitled to be covered by a patent, but it is un-necessary to decide that question in this case.

The defendants do not infringe Claim 7, construed as it must be construed under the prior art.

We now come to the second patent, Claims 7, 8 and 9 being in suit. They are as follows:

"7. In an ironing machine, a roller and a coacting shoe, and motor operated means for moving said shoe relative to said roller including a rocking shaft connected to said shoe, a driven cam, an arm loosely mounted on said rocking shaft and engaging said cam, a second arm fixed to said rocking shaft, and tension means interposed between said last-named arms.

"8. In an ironing machine, a roller and a coacting shoe, a casing, and motor operated means in said casing for moving said shoe relative to said roller, including a rocking shaft connected at its outer end to said shoe and extending into said casing, a driven cam, an arm loosely mounted on the inner end of said rocking shaft and engaging said cam, a second arm fixed to said rocking shaft, and tension means in-terposed between said last-named arms, said arms and tension means all being disposed within said casing.

"9. In an ironing machine, a roller, a coacting shoe, motor operated means for actuating said shoe, a lever connected with said shoe for rocking the latter toward and away from said roller, a rotating cam for actuating said lever, clutch means for said cam including a pawl rotatable with said cam and have detachable engagement with said motor operated means, means for moving said pawl out of operative driving engagement comprising a pair of tripping members disposed to automatically disengage said pawl after said cam and pawl have been rotated through a predetermined arc, stops associated with each of said tripping members for positively limiting rotation of said cam, and manually operated means for rendering said tripping members temporarily ineffective."

It was pointed out on the trial, and it will be observed, that the only material difference between Claim 7 and Claim 8, is the references in Claim 8 to a casing enclosing the operating means.

■ The Court is of the opinion that the ironing machine of the defendant, the Westinghouse Electric & Manufacturing Company, infringes Claims 7 and 8, if they are valid. The Court is further of the opinion that the disclosures of Claims 7 and 8 are anticipated by the Dady patent No. 1,652,561; Else patent No. 1,669,607; and Lester patent No. 394,585.

Does the defendant Westinghouse infringe Claim 9 of the second patent? Defendant Westinghouse Company says that it does not have in its device "a pair of tripping members disposed to automatically disengage said pawl after said cam and pawl have been rotated through a predetermined arc." The defendant says defendant does not have "a pair of tripping members." The defendant employs a special release mechanism for operating its clutch and pawl which requires only a single tripping member.

That is true. That is true, but that single tripping member is so designed as to have two ends, both of which are operated. I am in doubt on that question. The defendants say, however, this is a very specific machine, very definitely described, and I think probably nothing but that exact structure should be held to infringe this claim. I do not believe that element is to be found in defendants' structure.

970

Then again defendant says it does not have, "stops associated with each of said tripping members for positively limiting rotation of said cam." Counsel for the defendant, and its expert, say that there is always a clearance between the tripping dog and the clutch body, and that this clearance precludes positive stop action. And there was produced here one of the devices from one of the defendant's machines, and the contention of counsel and of the expert seems to be supported by the evidence.

■ Accordingly that Claim 9 is not infringed.

But lest the Court be mistaken in that conclusion, the Court will consider the question of validity of Claim 9. The prior art cited against that claim is Weller 1,-677,666; Weller No. 1,767,863; the Union ironing machine; Dady patent 1,652,561; Lindgren 1,561,611; Sperlich No. 1,670,-387. The Court thinks they are all pertinent, and that the Weller disclosures and the device from the Union ironing machine are anticipations, and accordingly the claim is invalid.